UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. <u>25-CR-80069-DMM</u>

UNITED STATES OF AMERICA

v.

ALI EMAD ATIEH,
   a/k/a "@The PaliAlawi,"
   a/k/a "@The PaliAlawii,"

      Defendant.
_____/

<u>GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF A
SENTENCE AT THE LOW END OF THE ADVISORY GUIDELINE
RANGE</u>

The United States of America, by and through the undersigned Assistant United States Attorney, respectfully submits its *Memorandum of Law in Support of a Sentence at the Low End of the Advisory Guideline Range* for Defendant Eli Emad Atieh (hereinafter "ATIEH" or "Defendant"). For the reasons set forth herein, a sentence of 18 months' imprisonment is sufficient, but not greater than necessary, to achieve the goals of sentencing. In support thereof, the government states the following:

**FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

**A. The Crime**

On January 6, 2025, the United States Capitol Police, Threats Assessment Section (TAS), was notified of a threat made on the social media platform X (formerly known as Twitter) against a sitting member of the United States Congress (referred to herein as "VICTIM CONGRESSPERSON") (PSI, ¶5). The threat was posted from an account subscriber using the

display name Ali Atieh, username @ThePaliAlawii (hereinafter "SUBJECT ACCOUNT 2")

(*Id.*).  On that date, the user of SUBJECT ACCOUNT 2 posted the following message:

> **"[VICTIM CONGRESSPERSON'S last name misspelled] I have your locations doxxed I can get around your security guards I have the best access to your window .. I'm gonna murder you and I'm gonna start with your children you motherfucker you watch me I'm coming for you. We will kill all of you America sellouts" [sic].[1]**

*Id.*

According to records maintained by X, the SUBJECT ACCOUNT 2 had the following subscriber information: Account ID: 1869990026756710400, Created At: 2024-12-20T06:15:49.274Z, Email: atieh67boy@gmail.com, Username: ThePaliAlawii, Account Display Name: Ali Atieh.  Additionally, the following two IP Addresses were captured for January 6, 2025: (a) Created At: 2025-01-06T12:53:17.000Z, Log In IP: 76.153.203.46; and (b) Created At: 2025-01-06T12:36:20.000Z, Log In IP: 107.123.37.72.  An open-source database search of the two IP addresses revealed the following information: (a) IP Address: 76.153.203.46 (IP Address 1), Location: Wellington, Florida, Service Provider: Comcast Cable/DSL; and (b) IP Address: 107.123.37.72 (IP Address 2), Location: Davenport, Florida, Service provider: AT&T Wireless Cellular.  An open-source database search of "Ali Atieh" in the state of Florida revealed only one result: Name: Ali Emad ATIEH, DOB: 10/07/2001, SSN: XXX-XX-3622, Address: 1281 Torrington Avenue, Wellington, Florida 33414.[2]

---

[1] "Doxxing" refers to the process of searching for and publishing private or identifying information about a particular individual on the internet, typically with malicious intent.

[2] The information contained in this paragraph is not included in the PSI.  Although this information is not needed as part of Defendant's Offense Conduct, the Government includes it here to demonstrate how law enforcement was able to fully identify ATIEH as the offender.  The Government will have a law enforcement witness available at sentencing the testify about this information if necessary.

### B.  Atieh First Interview

On January 6, 2025, USCP Special Agents responded to ATIEH's parent's residence located at 1281 Torrington Avenue, Wellington, Florida 33414 and interviewed ATIEH (PSI, ¶6). During the interview, the Defendant denied posting the January 6, 2025, threat.  When USCP agents read him the threatening post, the Defendant became very nervous.  He trembled and was unable to speak clear sentences.  He claimed, "I never said that" and "I don't recall making a post like that." ATIEH claimed that his display name was "Alawi" and username as @ThePaliAlawi (hereinafter the "SUBJECT ACCOUNT 1"). The display name "Alawi" is different than the reported display name of "Ali Atieh."  The username @ThePaliAlawi is slightly different from the username @ThePaliAlawii, which is missing the second "i". ATIEH stated he had not changed his display name nor his X username (*Id.*).

ATIEH provided agents with his email addresses as atiehali80@gmail.com and atieh67boy@gmail.com (which match information contained in the subscriber records associated with the SUBJECT ACCOUNT 2). Additionally, he provided his cellphone number as XXX-XXX-9103. He stated he had been using a loaner phone from Apple because his actual phone was at the repair store since the second week of December 2024.  Upon request, ATIEH provided agents with consent to search the cellphone (*Id.*).

### C.  Atieh Second Interview

On February 8, 2025, agents returned to ATIEH's parents' residence and conducted a second interview of ATIEH (PSI, ¶8).  During this interview, ATIEH was asked to verify his email addresses.  Atieh confirmed that he uses ali.atieh@trulieve.com and atiehali80@gmail.com.  When he was asked about his use and access to atieh67boy@gmail.com, he claimed that he no longer

used that account or had the password for that account.  Furthermore, he stated that he did not know who the VICTIM CONGRESSPERSON was until he was interviewed in January 2025 (*Id.*).

ATIEH was advised that it is important for him to be honest with agents and that if he was lying to them, he could be charged with a felony for providing false statements.  He stated that he did not pose a threat and that he was just a poor college student who does not pay much attention to politics.  He was asked if he had given his password to anyone or if his brother would have access to the email account in question.  He denied adamantly that anyone would have his old password or access to his account (*Id.*).

**D.  The Investigation[3]**

Subscriber records maintained by AT&T provided the following information about IP Address 107.123.37.72 (IP Address 2): "Individual IP assignments within this block are not stored by AT&T, and they do not have individual IP records for the IP in question."  Subscriber records maintained by Comcast revealed the following information for IP Address 76.153.203.46 (IP Address 1): Name: Emad Atieh, Address: 1281 Torrington Avenue, Wellington, Florida 33414, telephone number XXX-XXX-8811.  Subscriber records maintained by X revealed the following information for accounts associated with usernames @ThePaliAlawi and @ThePaliAlawii:

a.      @ThePaliAlawi, Account ID: 1863578040850145280, Created At: 2024-12-02T13:36:51.303Z, Email  Address:  ali.atieh@trulieve.com,    Username:  ThePaliAlawi, Account Display Name: Alawi (SUBJECT ACCOUNT 1);

---

[3] Unless otherwise noted, much of the information contained in this section is not included in the PSI.  As stated in footnote 2 above, the Government has included this information to demonstrate to the court how law enforcement was able to fully identify ATIEH as the offender.  The Government will have a law enforcement witness available at sentencing the testify about this information if necessary.

      b.      @ThePaliAlawii, Account ID: 1869990026756710400, Created At: 2024-12-20T06:15:49.274Z, Email Address: atieh67boy@gmail.com, Username: ThePaliAlawii, Account Display Name: Ali Atieh (SUBJECT ACCOUNT 2).

A comparison of both X IP Audit accounts activity showed that it appeared to be the same user for SUBJECT ACCOUNTS 1 and 2.  A check through IP Address search engines showed both accounts to be opened or accessed on or about the same time, at the same location, which was corroborated through open-source search via https://whatismyipaddress.com/.  Open-source database search on telephone number XXX-XXX-9103 came back to Ali E Atieh, 1281 Torrington Avenue, Wellington, Florida 33414, Service Provider AT&T.  Telephone number XXX-XXX-8811 came back to Emad Atieh, 1281 Torrington Avenue, Wellington, Florida 33414, Service Provider Verizon.

Based on the common contact and content analysis of the SUBJECT ACCOUNTS, the United States determined that the SUBJECT ACCOUNTS had the same user (PSI, ¶7).  Specifically, the user of both accounts communicated with at least 21 individuals having the same X handles or Screen Names (*Id.*).  Additionally, the account user for the subject accounts consistently used highly inflammatory words and phrases towards Israel and its war with the Palestinians in Gaza, such as "sewage rat", "diaper soldiers", "victim card", "racist Jew", "scum Jews", "Jew Nazi pig", "Jew schmuck", "doxxed", "dox" or variations thereof, such as the following (*Id.*):

- "*Keep crying Jew pig stop running to October 7th the **victim card** is long overused go cry in the corner u Jew Nazi*" in response to @KevinIrvine12 @NimaYamini @Osint613 on Wednesday, 12/04/2024, 17:27:43 hours.[4]

- "*Jew Nazi pigs are so racist you're mad that they don't stand with Israel anymore I mean who can after all the atrocities they have over played their **victim card** enough is enough Israel is a recordist occupying state*" in response to @Strikeatdawn31

---

[4] This post is not included in the PSI.

@neveragainlive1 @JustinTrudeau @liberal_party on Thursday, 12/05/2024, 1:00:13 hours.[5]

- "*Wishing her DEATH and DESTRUCTION* 🤣 😂 *just like u you fucking **Jew schmuck***" in response to @Amiran_Zizovi on Saturday, 12/07/2024, 12:39:49 hours (PSI, ¶7a);

- "*Wow I revealing ur true colors u Jews are fucking pigs and u wonder why the world fucking hates u lmao u gave me motivation to assault every Jew in my way ! Thanks u **Jew Nazi pig** if I ever see ur face I'll gladly spit on it*" in response to @mustangmus40673 @VividProwess on Saturday, 12/07/2024, 23:06:27 hours (PSI, ¶7b);

- "*It will never happen **Jew pig** keep dreaming I got ur IP address I'm gonna **dox** you I hope ur ready*" in response to @Amiran_Zizovi on Sunday, 12/08/2024, 14:14:14 hours (PSI, ¶7c);

- "*Yoseph I have u **Doxxed** I got ur address emails and phone numbers .... I'm gonna release them but first I'm gonna use this info to find u and murder u for all the Jews to see*" in response to @YosephHaddad on Sunday, 12/08/2024, 19:27:58 hours (PSI, ¶7d);

- "*I have you **doxxed** I can't wait to murder you*" in response to @EYakoby on Monday, 12/09/2024, 07:58:59 (PSI, ¶7e);

- "*I'm gonna murder u on ur way there better hide GEERT I got u **doxxed** emails , phone numbers and addressses prepare to die motherfuker*" in response to @geertwilderspvv @GilaGamliel on Monday, 12/09/2024, 18:43:15 hours (PSI, ¶7f);

- "🤣😂😂😂😂*showing ur true colors what a good pig you are u stupid ugly Jew Nazi piece of shit I'd love for u to say that to me so I can murder you relentlessly no worries tho being a hacker u get to **doxx** people so imma **dox** u bitch*" in response to @BenCarr10545566 @VividProwess on Wednesday, 12/11/2024, 09:51:31 hours (PSI, ¶7g);

- "*Ur the biggest rage bait troll you ugly Jew go die beofre I **doxx** u and throw U back Into ur chambers*" in response to @EYakoby @HilzFuld on Wednesday, 12/11/2024, 14:39:14 hours (PSI, ¶7h);

- "*Shut the fuck up with the victim card u Jews play that **victim card** so much go die we literally despise Jews fuck outta here*" in response to @lynn79214622492 @SamanAhsan @broseph_stalin on Wednesday, 12/11/2024, 14:41:54 hours (PSI, ¶7i);

---

[5] This post is not included in the PSI.

- "🤣🤣🤣🤣🤣🤣*openly admitting your racism towards Arabs and advocating for extermination how do you calm yourself moral?? Man I'm gonna have you **doxxed** I will find you and kill you I will start with your children. You need to be fking murdered. That's why you're baby died*" in response to @CherylWroteIt on Thursday, 12/12/204, 16:56:55 hours (PSI, ¶7j);

- "*Go fuck ur self u traitor pig ur a joke to all Arabs a sell out like ur leaders stupid pig don't let me **doxx** you and find u wallah bidak moot ya kalb*" in response to @maz_ibr55017 @VerminusM on Sunday, 12/15/2024, 12:44:48 hours (PSI, ¶7k);

- "*Shut the fuck up buddy before you become next I'm very good at **doxx**ong people I'll get you killed*" in response to @leekern13 on Thursday, 12/19/2024, 10:09:31 hours (PSI, ¶7l);

- "*Shut the f up pussy!!! Next time make sure the missles hit you ya dirty **sewage rat**"* in response to @leekern13 on Thursday, 12/19/2024, 12:09:25 hours (PSI, ¶7m);

- "*Shut the fuck up until dirty **sewage rat** go back to ur gas chamber*" in response to @WeinsteinLiran @leekern13 on Thursday, 12/19/2024, 12:10:38 hours (PSI, ¶7n);

- "*I have your location **doxxed** the goal to end u has never been so motivated*" in response to @WW3finalboss @Osint613 on Friday, 12/20/2024, 07:28:46 hours (PSI, ¶7o);

- "*Keep crying bitch you are just a racist and a piece of shit pajjeett Indian pretending to be a jew \n\nDoes everyone know you're a fake AI X account funded by Israel ? \n\nYou're a racist btch you and Vivid Prowess \n\nI have ur locations **doxxed** .. where your children go to school etc*", in response to @CherylWroteIt on Tuesday, 12/24/2024, 03:40:11 hours (PSI, ¶7p);

- "*You're a Zionist pig who posts false information.\n\nTHANK GOD I have your locations **doxxed**! \n\nI'm gonna find you Eyal and I'm gonna end you 16 different ways*" in response to @EYakoby on Wednesday, 12/25/2024, 01:41:49 hours (PSI, ¶7q);

- "*Accept the truth .. holocaust was faked for your own benefit 6 million people did not die.. only 271,000 did and even then the majority were starved. Like you're doing to the Palestinians so stop playing **victim card** that is long over with*" in response to @ignTechniq on Thursday, 12/26/2024, 11:35:12 hours.[6]

- *"I'm sure ur kids are embarrass that their gay tranny father is gender confused if watch my Louth before I **dox** u and murder ur family*" in response to @loneknight5 @CherylWroteIt @Osint613 on Saturday, 12/28/2024, 14:30:43 hours (PSI, ¶7r);

---

[6] This post is not included in the PSI.

- "*I have you **doxxed**! I'm gonna be releasing your information at 5pm EST*" in response to @CherylWroteIt on Friday, 01/03/2025, 15:04:57 hours (PSI, ¶7s);

- "*Cortes if stop talking before you get **doxxed** by me and I'll reveal to everyone that you're an illegal with no papers*" in response to @CyberPunkCortes @AKFOURTY7N @Megatron_ron Cortes on Friday, 01/03/2025, 15:10:56 hours (PSI, ¶7t);

- "*You're a soft keyabord warrior I'd stop talking before I **dox** u virgin*" in response to @MadMetalGuitar @Dr_logicaI @FahdAlhashmi on Monday, 01/06/2025, 01:50:09 hours (PSI, ¶7u);

- "*Post all you want you **sewage rat** END OCCUPATION LIFE THE SIEGE STOP KILLING INNCOENTS and your stupid hostages come home. Go cry to Bibi you fascist*" in response to @HenMazzig on Monday, 01/06/2025, 05:27:54 hours (PSI, ¶7v);

- "*I'm gonna **dox** you and murder your family you ugly mf! Prepare to lose your life you Asian piece of sewage shit*" in response to @KevinVuongMP on Monday, 01/06/2025, 05:31:39 hours (PSI, ¶7w);

- "*In your dreams Nazi pig go cry to Bibi in ur shelters you **sewage rats** 🤣*" in response to @charlesBBM12 @LionsOfZion_ORG on Monday, 01/06/2025, 05:33:26 hours.[7]

- "*[VICTIM CONGRESSPERSON's last name misspelled] I have your locations **doxxed** I can get around your security guards I have the best access to your window .. I'm gonna murder you and I'm gonna start with your children you motherfucker you watch me I'm coming for you. We will kill all of you America sellouts*" in a threat response to @\*\*\*\*\*\*\*\*\*\*\*\*\*[8] on Monday, 01/06/2025, 05:37:22 hours (PSI, ¶7x);

- "*Youre **doxxed** you ugly motherfucker I hope you have a fun*" in response to @HilzFuld @Graham_Slocombe @elonmusk on Monday, 01/06/2025, 12:56:22 hours (PSI, ¶7y);

- "*I can **dox** anybody I want \n\nI will **dox** all of you and you'll least expect it.\n\nWe're gonna annihilate Israel and we're gonna finish all of the American sellouts*" posted on Monday, 01/06/2025, 13:46:17 hours (PSI, ¶7z).

### E. Atieh's Third Interview and Arrest

On May 15, 2025, a grand jury sitting in the Southern District of Florida entered an

---

[7] This post is not included in the PSI.
[8] Agents believe the address redacted here is the VICTIM CONGRESSPERSON'S social media address.

indictment charging ATIEH with one count of making a threatening statement in interstate commerce, in violation of Title 18, United States Code, Section 875(c) (PSI, ¶9). On May 20, 2025, agents arrested ATIEH on the indictment (*Id.*). In a post-*Miranda* interview, ATIEH repeated his original claim that the account @ThePaliAlawi belonged to him, but that the account @ThePaliAlawii was not his account and he did not operate it (PSI, ¶10). The interviewing agents reminded him that it is in his best interest to be honest with the agents and that it is a crime to lie to federal agents during the investigation (*Id.*). Agents explained that all the information gathered in the investigation points to him and that it was sufficient to get an arrest warrant (*Id.*).

ATIEH responded by admitting that the social media account in question belonged to him (*Id.*). Atieh first said that he could have set up the X account and used his email address Atieh67boy@gmail.com and that he might have forgotten that fact because he suffers from memory loss due to his time playing football in middle school and high school (*Id.*). He denied adamantly that his comments were politically motivated (*Id.*). He claimed that he had a mix of emotions that made him read and make comments on social media that he should not have (*Id.*). He claimed further that he really did not know anything about the VICTIM CONGRESSPERSON until the week of post on January 6, 2025 (PSI, ¶11). He stated that his comment toward the victim was not based on his emotions to act on the statement, but as an outlet to vent (*Id.*).

ATIEH claimed that everything was a big mistake and that he was dealing with a lot of guilt stemming from the post (*Id.*). He stated that he understood the context of the threat but claimed that he did not pose a threat and was not planning to take action (*Id.*). He said that many of his posts on social media were not made with emotion but rather were made to troll others (*Id.*). Finally, he claimed that at time of making the threatening post, he may have been under the influence of edibles and had since forgotten about it (*Id.*). He denied using alcohol or marijuana

(*Id.*).

### F. Pre-Sentence Investigation Report

The United States Probation Office prepared a thorough PSI. Defendant's base offense level begins at 12. (ECF 32, *U.S.S.G.* § 2A6.1, PSI ¶ 15). He received a six-level increase for threatening a government employee for a total offense level of 18 (PSI ¶ 17). After acceptance of responsibility, his adjusted offense level is 15 (PSI ¶ 24).

In 2022-24, Defendant was cited three times for driving while license suspended (PSI ¶¶ 26-27). The first case was *nolle prossed* after ATIEH successfully completed a pretrial diversion program at age 20 (PSI ¶ 30). In the second case, he plead no contest at age 22 and adjudication was withheld (PSI ¶ 26). In the third case, he plead guilty at age 22 and adjudication was again withheld (PSI ¶ 27). Defendant has no other arrests. With a Criminal History Category I and adjusted offense level of 15, his advisory guideline range is 18 to 24 months' imprisonment (PSI ¶ 64). Based on the Section 3553(a) factors, the United States believes that a sentence at the low end of the advisory guidelines is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

## LEGAL ANALYSIS AND RECOMMENDATION

### I.   Generally Applicable Legal Principles

When determining the appropriate sentence, the district court should consider all applicable factors set forth in 18 U.S.C. § 3553(a). *See United States v. Gall*, 128 S. Ct. 586, 596 (2007). The listed factors in 18 U.S.C. § 3553(a) include the following:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed –

(A)   to reflect the seriousness of the offense, to promote respect for the law, and

to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)    the kinds of sentences available;

(4)    the kinds of sentence and the sentencing range established for –

(A)    the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines –

(i)    issued by the Sentencing Commission ...; and

(ii)   that, . . . are in effect on the date the defendant is sentenced; ...

(5)    any pertinent policy statement –

(A)    issued by the Sentencing Commission ... and

(B)    that, . . . is in effect on the date the defendant is sentenced.

(6)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)    the need to provide restitution to any victims of the offense.

## II.    <u>Section 3553 Analysis</u>

A review of the sentencing factors set forth in Section 3553 indicates that a sentence at the low end of the advisory guideline range is sufficient, but not greater than necessary, to achieve the goals of sentencing.  Defendant threatened to kill a member of the United States Congress.  Threats of violence and death on elected representatives who serve their constituents in our democracy cannot be permitted.  Thus, the nature and circumstances of the offense strongly support a guideline sentence.  Moreover, Defendant's history and characteristics, and the need for the

sentence to accurately reflect the seriousness of the offense, promote respect for the law, and provide just punishment support a sentence within the advisory guidelines.

### A.      The Nature and Circumstances of the Offense

Approximately 10 months ago, Defendant posted a message on social media threatening to kill a member of Congress and his family.  His threats were clear, direct, and explicit – he threated to "murder" the Congressperson and that he was going start by killing the Congressperson's children.  To enhance the credibility of his threat, he claimed that he had the Congressperson's location "doxxed" [sic] which enabled him to "get around your security guards."  He warned that he was "coming for you" and that "[w]e will kill all of you America sellouts."

Threats of this kind are serious because of the widespread harm that it causes.  To the victim, threats of violence cause substantial mental, emotional, and psychological injury.  Here, the threat to kill the Congressperson certainly placed the victim in fear of serious bodily injury or death.  The Congressperson knew nothing about the identity of the person who threatened to kill him and his children. Thus, he had no idea if Defendant knew his location and planned to carry out his threat.  By making an anonymous threat to kill, ATIEH accomplished his intended goal – to instill fear in his victim.  The pain and anguish that accompanied that fear is real and severe.

In addition to the individualized harm, ATIEH's threat harmed our democracy.  Clearly, Defendant chose his victim based on the Congressperson's employment as a member of Congress. As indicated in his many social media posts from December 7, 2024, to January 6, 2025, Defendant harbored vicious antisemitic views against the Jewish community and Israel.  For example, on December 7, 2024, he posted, "[W]ishing her DEATH and DESTRUCTION just like u you [expletive] Jew Schmuck" in response to another person's post.  He threatened to "dox" that same user the next day calling him a "Jew pig."  On December 11, 2024, he called another X user a "Jew

Nazi piece of shit" who he threatened to "murder relentlessly." On Christmas day in 2024, he called another X user a "Zionist pig who posts false information." On January 6, 2025, he posted a clear anti-Israel message when he wrote, "…END OCCUPATION LIFE THE SIEGE STOP KILLING INNCOENTS [sic] and your stupid hostages come home. Go cry to Bibi you fascist." "Bibi" is a clear reference to Benjamin Netanyahu, the Prime Minister of Israel who is known globally by his nickname "Bibi."

The VICTIM CONGRESSPERSON has made numerous public statements in support of Israel in its current war in the Middle East. See, e.g., *Call Me back Podcast with Dan Senor, Episode 318 (*February 27, 2025), https://podcasts.apple.com/us/podcast/*********-israel/id1539292794?i=1000696451028; https://www.npr.org/2024/06/29/nx-s1-5021789/***********-israel-netanyahu (June 29, 2024); https://www.usatoday.com/story/news/politics/2024/05/08/*************-israel-senate/73599330007/ (May 8, 2024).[9] As a consequence of his public support of Israel, ATIEH threatened to kill him and his family for the victim being perceived as an "America sell out."

Threats against members of Congress have been on the rise for years. In 2024, the United States Capitol Police investigated 9,474 Threat Assessment Cases against members of Congress. S*ee https://www.uscp.gov/media-center/press-releases/uscp-threat-assessment-cases-2024.* Although down from a record high of 9,625 cases in 2021, the 2024 total was a 18% increase from 2023 which saw approximately 8,008 cases, and a 26% increase from 2022 which saw approximately 7,501 cases. *Id.* Data reviewed by the National Investigative Unit shows an alarming trend: threats against members of Congress, their families, and staff have skyrocketed

---

[9] The Congressperson's name has been redacted from the citations in this paragraph to protect his/her identity. The Government can provide the court with the name of the Congressperson under seal if necessary for the court to access the content of the material cited in this paragraph.

by 950% between 2016 and 2024. https://www.kcra.com/article/rising-threats-against-lawmakers-security-upgrades/66056077.

Since ATIEH's death threats, threats against public officials have continued to rise. The U.S. Capitol Police has estimated that agents are on track to work through roughly 14,000 Threat Assessment Cases by the end of 2025. **https://www.wbal.com/data-visualization-rising-threats-against-lawmakers-spur-urgent-calls-for-security-upgrades.** This year alone has seen targeted attacks of state lawmakers and their spouses in Minnesota, arson at the residence of the Governor of the Commonwealth of Pennsylvania, and a threat to kill House Minority Leader of the United States House of Representatives.

State legislators have also been the victim of increasing number of threats. According to a report published in January 2024 by the Brennan Center for Justice, more than 40% of state legislators surveyed reported being threatened or attacked in the past three years. *See* time.com/6565184/violent-threats-public-officials/. Nearly 90% said they had suffered severe abuse, including harassment, intimidation, and stalking. *Id.* Almost 40% of the local officials said the ongoing harassment made them less willing to run for re-election or to seek higher office. *Id.*

Threats like those made by ATIEH damage our democracy because it causes elected leaders to fear for their lives and for the safety of their families. After the assassination of political activist Charlie Kirk, a member of the House of Representatives from the State of New York stated in September 2025, "I found myself over the past couple of days, you know, looking around a little bit more and being a little more careful than I normally would." https://www.npr.org/2025/09/16/g-s1-89053/people-are-scared-congress-grapples-with-increasing-political-violence. He added:

> "People are scared," Suozzi said. "I'm on several different text chains with members, and I just see a lot of comments back and forth about – 'what should we

do? How should we spend the money that's been allocated for this? What ideas do you have?"' (*Id.*).

Such threats undermine the rule of law and creates conditions of fear and intimidation for public officials and government workers.  This fear often discourages highly qualified elected leaders from continuing to participate in the democratic process.  A recent report on intimidation of state and local officeholders from the **Brennan Center for Justice,** a nonpartisan law and policy institute, found that half of the local officeholders who were women were less likely to run for reelection or a higher office due to threats against elected officials. https://19thnews.org/2024/02/threats-congress-women-security-spending/;          *See       also* https://www.axios.com/2024/01/19/threats-members-congress-2023 ("As a record number of lawmakers in both parties account plans to retire from Congress, [a House Administration Committee Ranking Member] suggested the rising threats public officials face should not be discounted as a factor").

Violence and threats of violence also tend to reshape the way public officials do their job. Many elected officials who have been threatened are less likely to engage with constituents, hold public events, or advocate for policies that could lead to blowback.  A female member of the House of Representatives from New York who's long faced death threats told reporters after the Kirk assassination that she was postponing a planned public event. https://www.npr.org/2025/09/16/g-s1-89053/people-are-scared-congress-grapples-with-increasing-political-violence.          Another Congresswoman from South Carolina also said in September 2025 that she was canceling outdoor and public events for the foreseeable future. *Id.*

As a result of this unprecedented rise in threats against our elected leaders, Congress is on track to spend more than $1 billion on the budget for the U.S. Capitol Police for the first time in history. https://www.politico.com/news/2025/09/26/lawmakers-are-scared-and-ready-to-spend-a-

1-billion-to-stay-safe-00581267.  Increase spending on security presents several downsides to our democracy, including cost to taxpayers, budgetary trade-offs, reduced public interaction, decreased transparency, and potential misuse of funds.

Recognizing the severity of these threat crimes, courts in this circuit and others have imposed severe prison terms, especially for those defendants convicted of threatening elected leaders and government employees.  Like the instant matter, many of those cases involved only one or a few threats.  For example, in September 2025, a Tennessee man was sentenced to 24 months in prison for threatening a member of Congress.  *United States v. Hayes*, 24-cr-00123-CLC-MJD (D. Tn., September 10, 2025).  In that case, Hayes called the district office of a Member of Congress and left the following voicemail: "Chattanooga. I'm in Chattanooga. Yeah, you better ask your kids to f***ing finally kiss your a**—'cause I'm gonna beat your a** b**ch. I'm gonna kill your a**. I'm gonna kill you b**ch."[10]  Like the instant case, the defendant's sentencing guidelines range was 18-24 months.  In imposing a sentence at the top of the guidelines, the Court stressed that society must be protected from Hayes, and others like him, who threaten to maim, and murder elected officials with whom they disagree.   https://www.justice.gov/usao-edtn/pr/chattanooga-man-sentenced-24-months-imprisonment-threatening-kill-member-congress.

In August 2024, a 73-year-old man was sentenced to 24 months' imprisonment for leaving three voicemail messages threatening to kill a member of Congress and the Congressperson's children.  *United States v. Shapir*o, 24-cr-80007-DSL (S.D. Florida, August 7, 2024).  Shapiro had

---

[10] Additional evidence of Hayes's relevant conduct introduced at the sentencing hearing revealed that, in January of 2024, Hayes, while outside the state of Tennessee, called the office of a different Member of Congress, which was not located in the state of Tennessee, and left that Member a voicemail, identifying the Member by name and stating: "I will slice your throat, mother f***er."

been convicted previously of threatening to kill an agent with the United States Capitol Police in October 2019. *United States v. Shapiro*, 19-cr-80221-DMM (S.D. Florida, August 7, 2024).

In *United States v. Russell*, 22-01661-PHX-SPL (D.C. Az., March 26, 2024), the defendant sent three voicemail messages for an election official with the Arizona Secretary of State's Office, in which he accused the public official of committing election fraud and threatened her life. Despite accepting responsibility for his crimes, the Court sentenced him to 30 months' imprisonment. *Id.*

In *United States v. Comiskey*, Case No. 22-cr-80084 (S.D. FL.), the defendant was charged with making five threats on social media against a Congresswoman from Colorado (*Id.* at Docket Entry 3). Comiskey pleaded guilty to making only one threat and the government dismissed the remaining four counts. The threat of conviction posted on Twitter read, "lf I ever saw Lauren I'd be glad to take her out and go to prison. Would be job well done." With a Criminal History Category of I, the court sentenced him within the advisory guideline range and imposed a term of 15 months' imprisonment. *Id.*

In October 2022, a 60-year-old woman was sentenced to 18 months in prison for threatening to kill an FBI agent who sought to question her about the events of January 6, 2021. *United States v. Kaye*, 21-80039-cr-RLR(s) (S.D. Fla, October 4, 2022). After agreeing to meet with the agent, Kaye posted a 45-second video on social media informing her "Facebook friends" that the FBI wanted to speak to her being at the Capitol on January 6. She announced that she would not speak to them and proclaimed that she would "exercise her Second Amendment rights to shoot [the agent's] f******* ass if you come here." She posted a second video minutes later with substantially the same content on another social media platform. *Id.*

At sentencing, Judge Rosenberg described Kaye's threat against a public servant "who

work each day to keep us safe, [as] serious... Incarceration is typical in sentencings for interstate transmission of a threat to injure based on the totality of cases the Court has reviewed." *Id.* at 196-197.

> Judge Rosenberg also recognized:
>
> Incarceration was also imposed in cases involving just one threat. For example, in United States versus Howard, the case that the Government submitted to this Court, Defendant Howard left one voice mail for Attorney General Eric Holder. In that voice message, he threatened to kill Attorney General Holder. In that case the sentencing Court sentenced Howard to 30 months in prison. In another case, United States versus Nicholas, Defendant Nicholas sent a total of four letters to the Inspector General. In one of the letters, he threatened to kill FBI agents. The sentencing Court in that case sentenced Defendant Nicholas to 45 months.

*Id.* at 197. While there was no evidence that the victim was personally harmed by Kaye, "that is not a reason not to treat Ms. Kaye's threat seriously as it is a serious crime, but instead, it is a factor that the Court takes into consideration when imposing a sentence." *Id.* After considering all sentencing factors pursuant to 18 U.S.C. 3553(a), including Kaye's significant history of seizures, the court sentenced her to 18 months' imprisonment (33% variance).

In *United States v. Hall*, 21-cr-00605-GHW (S.D. N.Y.), defendant placed a series of telephone calls on August 29, 2022, to the California office of a member of Congress and threatened to kill the Congressman to at least three different staff members. At sentencing, Court computed Hall's advisory guideline range to be 27 to 33 months' imprisonment and imposed a sentence of 20 months. *Id.* at DE 64.

In *United States v. Fratus*, 2021 WL 3145732 at *1, (E.D. Pa., July 26, 2021), the defendant sent two threatening emails from his i-Phone in Massachusetts against the Philadelphia Police Commissioner. In the emails, the defendant used racial expletives, called for hanging, and for "Jews into the ovens!!!" *Id.* At sentencing, the court described the defendant's offense as "disgusting, offensive, destructive and inexcusable on every level ... And there's no place or room

18

for what Mr. Fratus has done in any society much less a civilized one." *Fratus*, Case No. 20-00270-cr-GJP, (E.D. Pa, at DE 98:108).  The court then imposed an upward variance from the advisory guideline range of 31-37 months and sentenced him to 48 months in prison.[11]

In *United States v. Pratersch*, 808 Fed. Appx. 768 (11th Cir. 2020) (unpublished), the defendant was convicted after trial of making threatening phone calls to the office of a United States Senator from Vermont.  At sentencing, the court found that the defendant's threats were serious:

> I remember when I was a kid the civics teachers used to tell us, I disagree with you with every fiber of my being, but I will fight to the death to protect your right to say it. And I think that's being damaged by things like this. So I take it very seriously. And although I take you at face value you weren't going to fly up there and do anything. Maybe you didn't have the wherewithal to do it. But when you make that phone call, everything gets turned on its head. You have all of these federal law enforcement agencies that have to make take it seriously. They have to investigate it. They have to come down and talk to you. They have to begin a federal prosecution and do all of these things.

*United States v. Pratersch*, Case No. 19-cr-0026-CEM-T, at Docket Entry 87:13-14.  With the defendant having a Criminal History Category I, the court sentenced him at the low end of the advisory guidelines and imposed a sentence of 15 months' imprisonment. *Id.* at 15.  The court explained that it imposed a sentence within the advisory guidelines partly because the defendant did not accept responsibility for his crimes. *Id.* at 14.

In *United States v. Killingsworth*, 2020 WL 4703090 at *1 (N.D. OH., August 12, 2020), the defendant posted two threats against his local police department.  In a Facebook post, the defendant stated, "I think a cop needs killed around here again." *Id.*  On the police department's Facebook page, the defendant repeated the threat. *Id.*  He also wrote, "More cops need shot dead.

---

[11] Fratus's criminal history included prior assaultive behavior, including assault on law enforcement, threats to a Congresswoman, threats to an Islamic Center and Palestinian Businessman and an attack on homeless people.

*Id.*  They kill us, we kill them," as well as comments against specific individuals such as "Your kids need shot in front of you", "F you and your kids, you won that price", and "I'll see you in the woods." *Id.*  The court sentenced Killingsworth to the high end of the advisory guidelines range of 30 months in prison.

In *United States v. Howard*, 947 F.3d 936 (6th Cir. 2020), the defendant left a single voicemail message in 2017 for a former United States Attorney General at his law firm.  In the message, the defendant claimed to have been convicted in court previously in violation of the Double Jeopardy Clause of the United States Constitution.  He then threatened to kill the former Attorney General.  After being convicted at trial, the court sentenced him 30 months in prison.

In *United States v. Dierks*, 978 F.3d 585 (8th Cir. 2019), the defendant sent three threatening tweets to a United States Senator from Iowa. *Id.* at 588.  In the tweets, the defendant threatened to "fu up seriously in my sleep," and "I'll beat ur ass in front of ur window, I promise that." *Id.*  After being visited by law enforcement and requested to tone down the rhetoric, the defendant made several additional uncharged tweets wherein he continued to threaten the Senator. *Id.* at 589. Defendant was convicted at trial.  At sentencing, the court described the nature and circumstances of the offense as follows:

> In this day and age, threats and rants by people like Mr. Dierks have to be taken seriously. As we know, some individuals who behave this way, threatening others, do end up inflicting injury and death on others, and the Court takes defendant at his word. If a person makes threats, they should know that the recipients take those threats seriously. Because of the seriousness of this crime, a just punishment, a serious time in prison, is necessary.

*United States v. Dierks*, Case No. 17-cr-2065 (N.D. IA, at Docket Entry 97:59).  Due to the substantial number of threats and the victim being a high-ranking government official, the court imposed an upward variance from the advisory guideline range of 41 to 51 months and sentenced Dierks to 72 months imprisonment.

In *United States v. Hoff*, 767 Fed. Appx. 614 (6th Cir. 2019), the defendant left three voice messages at the office of United States Congressperson from Ohio that gave the Congressman concern for his safety and his family. *Id.* at 616. The Congressman contacted the Capitol Police to investigate the calls. *Id.* During the investigation, an investigating agent warned Hoff not to contact the Congressman's office again. *Id.* Nevertheless, Hoff left two additional voice messages four days after a shooting at a baseball practice in Washington D.C. where Republican congressmen and their staffs were fired upon. *Id.* In the messages, Hoff stated, "I think y'all better hit your knees and pray for the people that you're screwin' up their lives with your secret legislation....," and "We are taking our country back. We are on the march. The other day is the tip of the iceberg. I've tried to warn you.... Maybe the next one taken down will be your daughter, huh? Or even your wife. Or even you." *Id.* The court sentenced Hoff to 40 months imprisonment. *Id.* at 617.

In *United States v. Rana*, 773 Fed. Appx. 218 (5th Cir. 2019), defendant called the office of a United States Congressman from Louisianna via telephone and threatened to kill him. The Court imposed a sentence within the advisory guideline range of 30 months' imprisonment.

Consistent with these cases, ATIEH's crime was serious, especially since he targeted an elected member of Congress whose politics clashed with ATIEH's antisemitic hatred of Israel. As indicated above, ATIEH frequently posted hateful rhetoric, often referring to people he perceived as Jewish as a "sewage rat", "racist Jew", "scum Jews", "Jew Nazi pig", and "Jew schmuck" who he accused of playing the "race card" and who he claimed he had "doxxed." A sentence of incarceration is needed to accurately reflect the seriousness of the offense. Conversely, a sentence of probation or a substantial downward variance would send a message that death threats against public officials in government are not treated seriously.

ATIEH likely will argue at sentencing that his sentence should be mitigated by the fact that

he did not intend to carry out his threat.  Even if true, this fact provides little mitigation for several reasons.  First, the VICTIM CONGRESSPERSON was not aware of ATIEH's actual intent.  Rather, he was only aware of ATIEH's stated intent – to kill the victim's family.  Any speculation by the victim about ATIEH's actual intent at the time of the threat in no way assuaged his fear.  Second, the harm contemplated by the statute of conviction came to fruition – the victim was frightened for him and his family.  The fact that other harms like murder did not come to pass does not excuse or lessen the severity of the threat itself.

While our vibrant democracy allows a wide array of speech, including vile, vulgar, offensive, and unpopular statements, it cannot tolerate criminal threats.  Speech that crosses that line must be treated seriously to protect the safety of the victim and the sanctity of our democracy.  A prison sentence certainly would achieve that goal.

### B.      The History and Characteristics of the Defendant

ATIEH's numerous social media posts made within the month leading up to his criminal threat are riddled with antisemitic statements against Jewish people and the State of Israel.  The similarities between those messages and the criminal threat against VICTIM CONGRESSPERSON clearly demonstrate that ATIEH was motivated to commit the instant offense, at least in part, by his religious animus towards Jewish people.  When confronted by law enforcement about his threat, ATIEH refused to access responsibility for his conduct on three separate occasions.  Instead, he provided false and misleading information to the FBI to avoid accountability.  This conduct weighs heavily in favor of a guideline sentence.

### 1.  Crime Motivated by Antisemitism

Courts have long recognized that a defendant's history of racist or antisemitic statements are relevant to determine a person's dangerousness and to assess his character at sentencing,

especially where those views are connected to the offense conduct.  For example, in *United States v. Miner*, 2022 WL 7214447 (2nd Cir. 2022), the defendant plead guilty to possession of a defaced firearm.  At the conclusion of the sentencing proceeding, after reviewing the § 3553(a) factors in detail, the district court commented on Miner's "racist, anti-Semitic, misogynistic, gun-buying, criminal" character, as well as his expressed Nazi sympathies. *Id.*  The district court's final remarks, particularly objected to by Miner on appeal, reflect its considered conclusion that Miner purchased illegal assault weapons "to further his white nationalist ambitions." Id.  *Miner*, 2021 WL 2953178, at *2.  The district court explained that because of Miner's "racist, anti-Semitic, [and] misogynistic views," coupled with his "gun buying," he "presented a clear and present danger to the American public." *Id.* at *5.

On appeal the Second Circuit noted that the sentencing court's statements about defendant's odious views were made "[i]n response to mitigating evidence Miner presented to minimize his social media posts and future threat…" *Id*. at 2.  The district court found Miner's arguments unpersuasive and explained that Miner's social media posts "revealed him[ ] to be a full-blown Nazi." *Id.* ("When someone shows you who they are, believe them, the first time."). Therefore, the Second Circuit found the district court's reasoning relevant to both motive and potential for violence to the community—two considerations that the appellate court has upheld as permissible and relevant to sentencing. *United States v. Stewart*, 686 F.3d 156, 170 (2d Cir. 2012) (reiterating that evidence of beliefs or associational activities may be weighed by the sentencing court so long as they are relevant to prove permissible sentencing factors, such as motive); *United States v. Brown*, 479 F.2d 1170, 1174 (2d Cir. 1973) (affirming sentencing court's consideration of defendant's beliefs as relevant to the threat of violence to the community).

Similarly, *United States v. Hale-Cusanelli*, 3 F.4th 449 (D.C. Cir., July 7, 2021), the

defendant was charged with seven counts involving trespass and disorderly conduct in connection with events at the United States Capitol on January 6, 2021. At the detention hearing, the court expressed concern about the defendant's "well-documented history of racist and violent language" and the fact that he "has been generally engaged in hateful conduct, if not necessarily violent conduct toward a number of people with whom he's had contact." *Id*. Therefore, the court determined that defendant's history of hateful views was relevant in ordering him detailed pending trial. *Id.*; *See also United States v. Desimas*, 2021 WL 289336 (W.D.Wa., January 28, 2021) (defendant's history and characteristics suggest that "a long held deep bias and racist views about and towards Black persons … weigh against him in any assessment of his character and history").

In the case at bar, ATIEH has posted numerous antisemitic, homophobic, and xenophobic statements through his X account during the one-month period leading up to his first encounter with the FBI in this case. For example, on December 4, 2024, ATIEH responded to a post made by a perceive member of the Jewish community by stating, "*Keep crying Jew pig stop running to October 7th the victim card is long overused go cry in the corner u Jew Nazi.*" "October 7th" is a clear reference to the Hamas-led attacks on Israel on October 7, 2023, that started the Israel-Hamas war in the Middle East. On December 7, 2024, he wished "DEATH AND DESTRUCTION 🌈 😂 *just like u you fucking Jew schmuck*" in response to another perceived Jewish X user. Later that same day, ATIEH claimed that another X user who he called a "Jew Nazi pig" gave him "*motivation to assault every Jew in my way!*" He stated that "*if I ever see ur face I'll gladly spit on it.*" He claimed or threatened to dox 13 different X users, eight of whom he expressed a desire or intent to kill. He accused several other perceived Jewish users as playing the "victim card" and called many of them a "sewage rat."

VICTIM CONGRESSPERSON is among the targets of ATIEH's hateful, antisemitic views. Although he did not reference the victim's perceived Jewish faith or support for Israel, he did use the same tool of terror as he had done for all his other targets – he claimed to have doxed the victim. He also referred to the victim as "an America[n] sellout." ATIEH used this phrase in at least one other post to refer to people he perceived as Jewish or supporting Israel. Specifically, on January 6, 2025, ATIEH posted the following message:

> "*I can dox anybody I want \n\nI will dox all of you and you'll least expect it.\n\nWe're gonna annihilate Israel **and we're gonna finish all of the American sellouts**"* posted on Monday, 01/06/2025, 13:46:17 hours (emphasis added).

This message was posted approximately eight hours and nine minutes after the true threat made against the VICTIM CONGRESSPERSON.

These messages are clear – ATIEH harbored hateful, antisemitic views that caused him to post threatening messages targeting over a dozen individuals, including the victim in the instant case. ATIEH's antisemitism was the motive for his crime. Moreover, his violent rhetoric poses a clear and present danger to the community. Thus, Defendant's personal characteristics weigh heavily in favor of a guideline sentence.

## 2. Pre-Arrest Refusal to Accept Responsibility

ATIEH refused the accept responsibility for his conduct on three separate occasions when question by law enforcement. When first questioned on the day of the post, ATIEH claimed that he "never said that" and "I don't recall making a post like that." To lend credibility to his denial, he provided a false explanation – that his display name and username on the X account from where the post was made was "Alawi" and "@ThePaliAlawi," and not "Ali Atieh" and "@ThePaliAlawii" from the threat account. Instead of confessing and expressing contrition of his actions, ATIEH chose to lie.

ATIEH was interviewed again approximately one month later.  Despite having time to reflect on his prior dishonesty, ATIEH doubled down by again denying making the threat.  To escape accountability, he claimed that he no longer used the email address atieh67boy@gmail.com that is associated with the threat account or had the password for it.  He denied knowing the VICTIM CONGRESSPERSON and claimed that he is just a poor college student who does not pay much attention to politics.

Agents interviewed him a third time on the date of his arrest five months after the threat.  At the start of his post-*Miranda* interview, ATIEH lied for a third time when he repeated his claim that the threat account did not belong to him and he did not operate it.  After agents warned him about the consequences of lying and informed him that all the evidence pointed to him, ATIEH finally told the truth.

Even his confession, however, was replete with self-serving explanations of questionable reliability.  He explained that he "could have" been the person who set up the X account and used his email address Atieh67boy@gmail.com and that he "might have" forgotten that fact because he suffers from memory loss due to his time playing football in middle school and high school.  However, his PSI lists no documented history of mental loss or cerebral injury.  In fact, it lists a relatively healthy mental history.  ATIEH's father described ATIEH as having "no history of mental or emotional problems" (PSI, ¶43).  Dr. Rapa opined that ATIEH did not meet the full DSM-5-TR criteria for any mental health disorder (*Id.*).

In light of his clean mental health history, ATIEH's explanation of memory loss due to playing youth football appears contrived.  While ATIEH has a constitutional right to remain silent, he does not have a right to lie.  Had he invoked his rights against self-incrimination, his silence certainly would not be any indication of questionable character.  However, he chose to provide

false information to law enforcement.   To the bitter end, ATIEH failed to thoroughly accept responsibility for his actions.  By doing, he exhibited questionable character that weighs in favor of a guideline sentence.

### 3.   Multiple Arrests for Driving While License Suspended

According to ATIEH's Pre-Trial Services Report, he has been cited three times for driving while license suspended.  He was first cited in February 2022 at age 20.  The citation was *nolle prossed* in June 2022 after Defendant successfully completed a pretrial diversion program, defense driving school, and payment of cost of prosecution.  Despite still having his license suspended, ATIEH continued to drive.  In October 2023, he was again cited at age 22.  He plead *nolo contendre* and paid fines and costs in January 2024.  Six months later, he did it again – cited for a third time in June of 2024.  He pled guilty and again paid fines and costs.  Four months later, he committed the instant offense.

Although these offenses are relatively minor, Defendant's conduct demonstrates a pattern of refusing to comply with the law.  This history reflects questionable judgment and personal characteristics.  As such, these facts weigh in favor of a guideline sentence.

### 4.   Dr. Sheila Rapa's Psychological Evaluation and Risk Assessment

Defense counsel has informed the government that ATIEH has filed under seal a psychological evaluation and risk assessment report conducted by Dr. Sheila Rapa, Psy.D. dated October 28, 2025.[12]  In short, Dr. Rapa has opined that ATIEH's overall risk of violence is "very low" and that he "would benefit from structured psychoeducational counseling focused on emotional regulation, online behavior, free speech limited (i.e. threats, yelling fire in a crowded

---

[12] ATIEH has provided a copy of Dr. Rapa's report to the government and the Probation Office.

theatre, etc…) and the psychological impact of social media use." *See* Dr. Sheila Rapa's Report, at p.18.

Certainly, any information submitted to the court about Defendant's background, including his medical history and current medical conditions, are relevant for the Court to consider at sentencing. However, Dr. Rapa's report does not provide a clinical explanation or justification for ATIEH's criminal conduct. In fact, much of her report demonstrates that ATIEH's offense conduct was not caused by any mental impairment. Rather, his actions were intentional efforts to inflict pain on others. As such, her report is a "mixed bag" when viewed through the prism of assessing his history and personal characteristics.

Dr. Rapa offers the following explanation for ATIEH's criminal conduct:

> … his language online was shaped less by genuine violent intent and more by what is colloquially known as rage baiting and trolling. In online culture, trolling involves posting inflammatory or offensive statements not because one believes them or intends to act on them, but because the provocation itself becomes the goal, baiting others into emotional responses.

*See* Dr. Rapa's Report, at p.17. She describes his online activity as "wide-ranging insults, racist and antisemitic rhetoric, and threats scattered across multiple accounts and individuals. This pattern more closely resembles the impulsive, reactive, attention seeking nature of trolling than with targeted pre-offense planning." *Id.* at 18.

The doctor makes clear that ATIEH's online activity is not connected to any mental impairments. She opined that he does not have any history of "major mental illness or antisocial lifestyle" and that he does not meet the full DSM-5-TR criteria for any mental disorder. *Id.* at 16. She also notes that ATIEH has demonstrated "no evidence of a persistent depressive, bipolar, psychotic, substance-related, or personality disorder." *Id.*

Instead, ATIEH's online activity (i.e. trolling) were intentional acts designed to hurt people (i.e. "baiting others into emotional responses."). For years, researchers have found that "[t]rolling can cause significant harm and distress. It is associated with serious physical and psychological effects, including disrupted sleep, lowered self-esteem, depression, self-harm, suicidal ideation, and in some cases, even suicide." *"New Research Shows Trolls Don't Just Enjoy Hurting Others, They Also Feel Good About Themselves,"* The Conversation, Published September 16, 2020 (hereinafter "The Conversation Piece"). "It also damages online communities by creating a hostile environment, disrupting conversations, and eroding trust through misinformation and harassment." *See Internet Trolls: Pushing Your Buttons, or Pushing An Agenda?,*" United States Cybersecurity Magazine, September 30, 2018. In 2019, The Australia Institute estimated trolling and online abuse had cost the Australian economy up to $3.7 billion in health costs and lost income. The Conversation Piece, *supra.*

Dr. Rapa does not address these harmful effects that ATIEH's conduct had on the targets of his trolling. Rather, she focuses predominately on ATIEH's claim that he did not intend to commit actual physical harm. While relevant to sentencing, his lack of intent to commit actual violence does not exonerate him from the harm he actually caused. Moreover, it does not negate the poor personal characteristics that he demonstrated through his intentional, criminal behavior.

Dr. Rapa also appears resistant to addressing ATIEH's excuse peddling. For example, during her interview of him, ATIEH claimed that he "got influenced by what was coming through my feeds." *See* Dr. Rapa's Report, p.7. He stated that he "felt pressure to take a side" in the online discussions about the war in the Middle East and got "sucked in to what I was seeing." *Id.* The doctor seems to accept his deflection when she opined that he exercised "extremely poor judgment **under the influence of** online rage cycles." Id. at 18 (emphasis added).

She also does not address how ATIEH's excuse peddling is consistent with his use of false statements and refusal to accept responsibility when questioned by law enforcement.  Instead of talking about online triggers, ATIEH denied repeatedly having made the threatening post.  When he finally confessed, he tried to explain his prior denials by claiming that he may have forgotten about the posts due to memory loss caused by his time playing middle school and high school football.  Dr. Rapa does not address whether ATIEH's false statements to law enforcement undermine his current claim that he was triggered to make the hateful statements that he now renounces.

Thus, Dr. Rapa's report must be considered in the context of the Section 3553 factors.  In that context, her opinions provide limited value in determining an appropriate sentence.  As indicated above, Section 3553 directs the Court to consider a wide range of factors, including the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and to afford adequate deterrence to the criminal conduct.  While the Government acknowledges that ATIEH likely would benefit from the health services she recommends, sentencing is not about what is best for the offender.  Sentencing is about imposing a sentence that is sufficient, but not greater than necessary, to promote the many goals of sentencing.  When considering all those goals, a sentence at the low end of the advisory guideline range is sufficient but not greater than necessary.

### C.    Need for the Sentence Imposed to Reflect Seriousness of the Offense, Promote Respect for the Law, and to Provide Just Punishment for the Offense.

In sentencing the defendant, the court must consider the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment. 18 U.S.C. § 3553(a)(2).  As explained above, ATIEH threatened to kill the VICTIM CONGRESSPERSON

because of his role as an elected official.  Clearly, he made the threat because he wanted to instill fear in his victim.  A threat to kill an elected official is a very serious offense.  To ensure the integrity of our democracy, every elected everywhere must assured that they are able to do their jobs without fear of physical violence from those who are disgruntled.  The rule of law demands nothing less.  An 18-month prison sentence is needed here to reflect the seriousness of the offense, promote respect for the law, and provide just punishment.

### D.      Afford Adequate Deterrence to Criminal Conduct.

In the past several years, we as a nation have become increasingly polarized along political and ideological lines.  Passionate speech, even unpopular or provocative language, is healthy to a vibrant democracy where people's voices contribute to the marketplace of ideas.  However, criminal threats serve no useful purpose.  As such, the consequences for such criminal behavior should be severe to deter people from engaging in such behavior.  As stated above, threats to kill our elected leaders, and prosecutions for those threats, have increased significantly over the past few years.  *See*, *e.g.*, *United States v. Hayes*, 24-cr-00123-CLC-MJD (D. Tn., September 10, 2025) (defendant left a voicemail message threatening to kill a member of Congress); *United States v. Michael Shapiro*, 24-cr-80007-DMM (S.D. Fla, August 7, 2024) (defendant allegedly called the office of a United States Congressman on December 19, 2023, and said that he was "going to come after you and kill you" and that he was "going to come after you and kill your children); *United States v. Sean Patrick Cirillo,* 23-cr-00365-VMC-JKL (N.D. Ga.) (defendant allegedly called United States Congresswoman's office on November 8, 2023, and threatened violence against her, her staff, and their families – "I'm going to kill her next week. I'm going to murder her. I'm gonna shoot her in the [expletive] head, okay?"); *United States v. Ingalls, Jr.*, 23-mj-00083-DFB (on November 6, 2023, defendant left two voicemail messages on the main congressional office

answering system in Washington, D.C. threatening to kill the same United States Congressman); *United States v. Brian Landry*, 23-cr-00073-SE-AJ (D.N.H.) (defendant allegedly called district field office of a United States Senator and left a voicemail message on May 17, 2023, that stated, in part, "You're a dead man walking, you piece of f\*\*\*ing sh\*\*").

The need to deter is particularly strong here when the target of the threat is a member of Congress who needs to serve his constituents without fear of physical harm from those who disagree with him. *See, e.g., United States v. Voneida*, 2008 WL 189667 at 3 (E.D.PA., January 18, 2008) (the court recognized that the effect of a "true threat" upon institutions required to take seriously even joking threats, however, is one of the evils that a statute like § 875(c) attempts to deter); *United States v. Feeney*, 2022 WL 580955 at *4 (E.D.N.Y., February 25, 2022) (court stated that a sentence at the high end of the guidelines for transmitting a threat in interstate commerce in violation of § 875(c) recognizes the seriousness of the Defendant's conduct and provides for both specific and general deterrence); *United States v. Pratersch*, 808 Fed.Appx. 768, 771 (court cited need to deter the defendant and others among basis for imposing 15-month jail sentence for threatening officials based on their political viewpoint).

Threats against political leaders are assaults against our democracy. Violent rhetoric must never be tolerated in a civilized democracy where the safety of members of our democratic institutions must be sacrosanct. To clearly delineate the line between acceptable and unacceptable speech, our courts should send a clear message that violent speech will not be tolerated. A sentencing within the advisory guideline range will send that clear message. Conversely, a light sentence would send the wrong message to this defendant and others. In effect, it would tell offenders like the defendant that such speech carries with it little to no consequences. That message would undermine the seriousness of the conduct and do little to prevent it from re-

occurring.

**E.      Conclusion**

Based on the sentencing factors of 18 U.S.C. 3553, the government respectfully requests this court impose a sentence at the low end of the advisory guideline range, followed by three years of supervised release.  This sentence is sufficient, but not greater than necessary, to comply with the purposes of sentencing.  The factors that support this recommendation include the nature and circumstances of the offense; the history and characteristics of the defendant; and the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; and to afford adequate deterrence to the criminal conduct.

Respectfully submitted,

JASON A. REDING QUINONES
UNITED STATES ATTORNEY

By:      */s/ Mark Dispoto*
Mark Dispoto
Assistant United States Attorney
Court Id. No A5501143
500 South Australian Avenue
West Palm Beach, Florida 33401
Tel: (561) 209-1032
Mark.dispoto@usdoj.gov

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on November 3, 2025, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

*/s/ Mark Dispoto*
Mark Dispoto